630 F.2d 224
 Michael D. MAGNO, Plaintiff,
v.
Helen Louise Bowling CORROS, Administratrix of the Estate of
Richardo Abello Corros, Appellee,
v.
The UNITED STATES of America, Appellant,
Exxon Corporation, Third-Party Defendant.
 No. 78-1175.
 United States Court of Appeals,
Fourth Circuit.
 Argued Dec. 3, 1979.
Decided Sept. 10, 1980.
 
 Allen van Emmerik, U. S. Dept. of Justice, Washington, D. C. (William G. Kanter, U. S. Dept. of Justice, Barbara Allen Babcock, Asst. Atty. Gen., Washington, D. C., Thomas E. Lydon, U. S. Atty., Lincoln C. Jenkins, III, Asst. U. S. Atty., Columbia, S. C., on brief), for appellant.
 Wheeler M. Tillman, Charleston Heights, S. C. (Tillman & Waggoner, Charleston Heights, S. C., on brief), for appellee.
 Before BRYAN, Senior Circuit Judge, and WIDENER and MURNAGHAN, Circuit Judges.
 WIDENER, Circuit Judge:
 
 
 1
 Plaintiff's[1] decedent, Richardo Corros, died of injuries received when the motorboat he was operating collided with a sheet steel dike built and maintained by the United States. Plaintiff sued the United States, alleging that the government's failure properly to light the dike was the cause of the accident. After trial, the district court, 439 F.Supp. 592 (D.S.C.) held the decedent 75 percent at fault for the collision and the United States 25 percent at fault. The government appeals from that judgment on the ground that it was under no duty to provide additional lighting on the dike. We agree with the government's contention and therefore reverse.
 
 
 2
 On the morning of September 29, 1973, the decedent and two passengers went fishing in the decedent's boat, a fifteen-foot open outboard. The men launched the boat on the Cooper River at Charleston, South Carolina, and later in the day proceeded to the Wando River for fishing. The Wando and the Cooper come together south of Daniel Island.
 
 
 3
 At the completion of the day they headed toward the Cooper River, with Mr. Corros at the controls of the boat. He rounded the southern tip of Daniel Island to starboard to run northbound on the Cooper, and ran outside the marked channel taking buoys N44 and R46 to port and Daniel Island to starboard. The speed of the boat was between 29 and 39 miles per hour.
 
 
 4
 In the glove compartment of the boat was a chart of that area of the river clearly showing the dike with the light at its channel end, but Corros apparently did not use it on this occasion. Additionally, he did not use the boat's searchlight.
 
 
 5
 At about 8:00 p. m., in clear weather and when it was almost completely dark, the boat hit the Daniel Island Contraction Dike at a point about 280 feet shoreward from its channel end. All three men were thrown into the water and were injured. Corros died of his injuries some five days after the accident.
 
 
 6
 The Daniel Island Contraction Dike, built pursuant to Congressional authorization,[2] was completed in February 1959. Its purpose was to increase the water velocity in the Cooper River channel and reduce shoaling in the channel caused by upstream activities of the State of South Carolina. The dike is a sheet steel pile structure extending 1,100 feet to the southwest from Daniel Island. The shore end is anchored in a 100 foot long rubble mound. The channel end is anchored by a terminal cell, a sheet steel pile cylinder twenty-three feet in diameter, filled with crushed rock. At the time of the collision, the top of the dike was approximately two feet above the surface of the water, and the district court found it was not visible to an approaching boater.
 
 
 7
 At the channel end of the dike is Cooper River Dike Light 46-A, a fifteen foot high fixed tower structure supporting an all-around white light that flashes every four seconds. It is the only light to mark the dike and is designed to mark both the channel's eastern boundary and the end of the dike. Light 46-A complies with the lateral buoyage system of the United States, and correctly marks the channel and the channel user's way around the dike. The light was functioning properly at all pertinent times.
 
 
 8
 Corros, having fished in the area for several years prior to the collision, was aware of the existence and location of the dike and Light 46-A. After purchasing his own boat in February 1973, he fished in the area often, usually returning after dark and always going around the dike and Light 46-A.
 
 
 9
 At the time of the collision, Corros had neither of his passengers keep a lookout, although he was looking ahead from his position at the wheel. Apparently no one in the boat saw the dike until the boat was close to the point of impact. The boat hit the dike approximately head-on.
 
 
 10
 Based on these facts, the district court held that having constructed the dike, the United States undertook to mark it, and under Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955), and Lane v. United States, 529 F.2d 175 (4th Cir. 1975), it was required to do so in a manner so as not to abuse its discretion. The court concluded that due to the appearance and visibility of the dike in question, the United States was grossly negligent in marking it with a solitary light on the channel end, and therefore clearly abused its discretion. The court concluded that the government was 25 percent at fault for the collision and Corros 75 percent at fault. This appeal followed.
 
 
 11
 It is a familiar rule of tort law that there is no liability for negligence in the absence of a duty and breach of that duty. W. Prosser, Law of Torts § 30, at 143 (4th ed. 1971). Thus, a decisive issue in this case is whether the United States was under a duty to provide additional lighting or some other type of marking on the dike as a warning to boaters in the area. Two theories are argued in support of finding that duty, both of which, however, fall short in this case.
 
 
 12
 First, plaintiff contends that 14 U.S.C. § 86 applies and under Lane v. United States, 529 F.2d 175 (4th Cir. 1975), the Coast Guard abused its discretion in failing to provide additional lighting on the dike. Section 86 states in relevant part:
 
 
 13
 The Secretary may mark for the protection of navigation any sunken vessel or other obstruction existing on the navigable waters . . . of the United States in such manner and for so long as, in his judgment, the needs of maritime navigation require. . . . This section shall not be construed so as to relieve the owner of such obstruction from the duty and responsibility suitably to mark the same and remove it as required by law. . . .
 
 
 14
 Plaintiff argues, and the district court held, that when the government undertook to mark the dike, it was so grossly negligent in the marking of it that it abused its discretion under Lane and was therefore subject to liability for the collision.
 
 
 15
 In Lane a ski boat collided with an unmarked barge that had wrecked and sunk some five years earlier. The original owner of the vessel had failed to remove it after it sunk, and under 33 U.S.C. § 409[3] it was therefore treated as abandoned and thus subject to the ownership of the United States. Each of the five years after the sinking of the barge approximately eight to ten boats had run upon it. This court held that, although under § 86 the government is under no mandatory duty to mark submerged wrecks, it must exercise its discretion responsibly and cannot "ignore submerged wrecks of which (it) is informed, or fail to mark them if they constitute real dangers to navigation." Id. at 179. The court concluded that under the Suits in Admiralty Act, 46 U.S.C. §§ 741 et seq., the United States is to be held accountable whenever a private person, in similar circumstances, would be,[4] and the clear responsibility of private owners to mark sunken vessels requires the Coast Guard to exercise "care and prudence to mark submerged wrecks which constitute substantial hazards to navigation." Id.
 
 
 16
 Lane is distinguishable for two reasons. First, we do not think 14 U.S.C. § 86 applies to the present case. Even though the literal words of the statute may not limit that section to obstructions such as sunken wrecks,[5] we do not feel that it applies to the dike in the present case. The dike, although technically an obstruction in navigable waters, is in fact an aid to navigation for it was constructed in order to increase the water velocity in the Cooper River and therefore assist navigation. Of additional import is the fact that Congress authorized that the dike be constructed in the first instance. Cf. Chute v. United States, 610 F.2d 7, 10-11 (1st Cir. 1979), cert. denied, --- U.S. ----, 100 S.Ct. 2155, 64 L.Ed.2d 789 (1980) (holding 33 U.S.C. § 409 inapplicable to a ship deliberately sunk for use as a bombing target). We feel that § 86 is inapplicable to a structure such as the dike in this case which was constructed for a proper governmental purpose.
 
 
 17
 Even if we assume that § 86 applies to the present case, Lane still provides no basis for imposing liability upon the government. Lane held that the government can be held liable in admiralty whenever a private person would be. But to find liability there must first be found a duty violated. In Lane the court emphasized that Congress in 33 U.S.C. § 409 had imposed upon private owners a duty to mark their sunken vessels, and that justified imposing such a duty, although discretionary, upon the government.[6] Plaintiff here has presented us with no authority and has introduced no evidence that would impose upon anyone a duty to mark the dike any more clearly than the United States did in this case. We decline to impose this even higher duty on the government. Thus, Lane is inapposite for it requires that a duty be found in the first instance.
 
 
 18
 Plaintiff also argues that the government in undertaking to light the dike did so in a negligent manner and under Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955), it therefore is liable for the death of Corros. An examination of Indian Towing demonstrates that the argument is not well taken.
 
 
 19
 Indian Towing involved a suit under the Federal Tort Claims Act, 28 U.S.C. § 1346(b), for damages allegedly caused by the negligence of the Coast Guard in the operation of a lighthouse light. The Coast Guard, which operated the lighthouse, had neglected to repair it when it quit functioning properly. Plaintiff brought suit against the United States after its tug ran aground in the area of the lighthouse. The Supreme Court, in acknowledging the "good Samaritan" rule of tort law, id. at 64-65, 76 S.Ct. at 124, held:
 
 
 20
 The Coast Guard need not undertake the lighthouse service. But once it exercised its discretion to operate a light on Chandeleur Island and engendered reliance on the guidance afforded by the light, it was obligated to use due care to make certain that the light was kept in good working order; and, if the light did become extinguished, then the Coast Guard was further obligated to use due care to discover this fact and to repair the light or give warning that it was not functioning. If the Coast Guard failed in its duty and damage was thereby caused to petitioners, the United States is liable under the Tort Claims Act.
 
 Id. at 69, 76 S.Ct. at 126.[7]
 
 21
 In the present case, the Coast Guard undertook only to light the channel end of the dike with a light, and at no time did it fail to perform that undertaking. The record is entirely void of any evidence showing that the light somehow would induce a boater to believe that there was nothing between it and land. The chart published by the government, for example, is to the contrary. Also important is the fact that the Coast Guard never undertook to provide additional lighting or markings on the dike; it therefore could never have engendered reliance on additional markings. The only undertaking of the Coast Guard was maintaining the light on the end of the dike, and the record indicates that this undertaking was performed properly.
 
 
 22
 The Indian Towing doctrine is therefore inapplicable to the present case, for at no time did the government exercise its discretion to lead the public or the plaintiff to believe that there was safe passage between the light and the land.
 
 
 23
 Although the limited resources of the Coast Guard may not be a decisive factor in the determination of this case, we should not be oblivious to those budgetary considerations in ascertaining whether or not there has been an abuse of discretion. Given the tremendous expense which would undoubtedly be involved in lighting all the authorized obstructions under the control of the Coast Guard,[8] in the absence of a Congressionally imposed requirement of additional marking, we feel that it is usually inappropriate for a federal court to impose such a requirement and in effect direct the Coast Guard how to spend its limited resources. Every dollar of its money that we direct it spend is diverted from another regulatory activity. Cf. Gercey v. United States, 540 F.2d 536, 538-39 (1st Cir. 1976), cert. denied, 430 U.S. 954, 97 S.Ct. 1599, 51 L.Ed.2d 804 (1977).
 
 
 24
 Accordingly, the judgment of the district court is
 
 REVERSED.[9]
 
 
 [1]
 A passenger in the decedent's boat initially brought suit against Mrs. Corros, administratrix of the estate, for injuries received in the accident. Mrs. Corros sought indemnity against the United States for any amount of her liability and damages for the death of her husband. The passenger ultimately settled his claim with the Corros estate, so the only issue on appeal is that of the government's liability to Mrs. Corros
 
 
 [2]
 River and Harbor Act of September 3, 1954, 68 Stat. 1248, amending the River and Harbor Act of October 17, 1940, 54 Stat. 1198
 
 
 [3]
 33 U.S.C. § 409 states in pertinent part:
 (W)henever a vessel . . . is wrecked and sunk in a navigable channel . . . , it shall be the duty of the owner . . . to immediately mark it with a buoy or beacon during the day and a lighted lantern at night, and to maintain such marks until the sunken craft is removed or abandoned, and the . . . failure of the said owner so to do shall be unlawful; and it shall be the duty of the owner . . . to commence the immediate removal . . . and failure to do so shall be considered as an abandonment . . . .
 
 
 [4]
 46 U.S.C. § 742 states in pertinent part:
 In cases where . . . if a private person or property were involved, a proceeding in admiralty could be maintained, any appropriate nonjury proceeding in personam may be brought against the United States . . . .
 
 
 [5]
 Prior to 1965, 14 U.S.C. § 86 referred only to marking "any sunken vessel or other similar obstruction . . . ." 14 U.S.C. § 86 (1956). In 1965, the word "similar" was deleted from the section. See Doyle v. United States, 441 F.Supp. 701, 709 (D.S.C.1977). See also Senate Report n. 688, U.S.Code Congressional and Administrative News 1965, Vol. 2, 89th Congress, 1st Session, p. 3140
 
 
 [6]
 Compare Chute v. United States, 610 F.2d 7 (1st Cir. 1979), in which the First Circuit refused to apply § 409 where a boater collided with the remains of a vessel that the Navy had intentionally scuttled for use as a bombing target. The court held § 409 inapplicable to an obstruction originally placed for a proper governmental purpose
 
 
 [7]
 See also Somerset Seafood Co. v. United States, 193 F.2d 631, 635 (4th Cir. 1951), in which the United States, in marking a wreck, had placed the buoy some 500 feet from its proper location. This court held:
 (E)ven if the decision to mark or remove the wreck be regarded as discretionary, there is liability for negligence in marking after the discretion has been exercised and the decision to mark has been made. There is certainly no discretion to mark a wreck in such a way as to constitute a trap for the ignorant or unwary rather than a warning of danger.
 In the present case, there has been no showing that the single light on the dike in question is a trap for the unwary.
 
 
 [8]
 While the record is silent as to the number of unlighted obstructions to navigation present in the navigable waters of the United States, it does indicate that there are some 631 unlighted buoys and over 3200 unlighted beacons located in the Seventh Coast Guard District alone
 
 
 [9]
 Most of the essential facts in this case are indistinguishable from those of Bearce v. United States, 614 F.2d 556 (7th Cir. 1980). The light in Bearce was at the end of a breakwater, and the Seventh Circuit held that the discretionary function exception to the Tort Claims Act should be implied in cases under the Suits in Admiralty Act. The First Circuit agrees with the Seventh. Chute v. United States, 610 F.2d 7 (1st Cir. 1979); Gercey v. United States, 540 F.2d 536 (1st Cir. 1976). The Fifth Circuit, in De Bardeleben Marine Corp. v. United States, 451 F.2d 140 (5th Cir. 1971), agrees with Lane of this circuit