**CORPORACION INSULAR de SEGUROS et al., Plaintiffs,**

v.

**UNITED STATES of America, et al., Defendants.**

Civ. No. 81–2217 HL.

United States District Court, D. Puerto Rico.

Sept. 11, 1986.

Antonio M. Bird, Jr., Bird & Bird, San Juan, P.R., for plaintiffs Gustavo Nevárez, Carmen Muñiz, Melanie Martínez and Corporación Insular de Seguros.

Ubaldo Lugo Cruz, Río Piedras, P.R., for plaintiffs Carlos Nevárez Pérez (deceased 8–20–86) Iberia Barceló Nevárez and María de los Angeles Nevárez Barceló.

Wanda Rubianes, Asst. U.S. Atty., Hato Rey, P.R., Damon C. Miller, Torts Branch, Civil Div., U.S. Dept. of Justice, Washington, D.C., for defendants.

## OPINION AND ORDER

LAFFITTE, District Judge.

Plaintiffs, Corporación Insular de Seguros, Gustavo Nevárez, Carmen Muñiz, the conjugal partnership formerly existing between them, and Melanie Martínez, brought this action against defendant United States of America, for injuries and damages incurred in the July 30, 1980 boating accident involving the 32′ cabin cruiser, the REMOLONA. Corporación Insular de Seguros ("Corporación") is a corporation doing business within the district as a marine insurer, and is the primary carrier responsible for claims arising out of the July 30, 1980 accident.[1] Plaintiffs Gustavo Nevárez and Carmen Muñiz, and the conjugal partnership previously existing between them were the owners of the 32′ REMOLONA. Plaintiffs Gustavo Nevárez and Melanie Martínez were present on board at the time of the accident.[2] Defendant United States of America is subject to the jurisdiction of this Court pursuant to the Suits in Admiralty Act, 46 U.S.C. sect. 741 *et seq.*

The subject accident occurred when the REMOLONA struck the 1,500 foot breakwater maintained by the United States

---

**1.** Plaintiff Corporación Insular de Seguros entered into a settlement agreement with passengers Carlos Nevárez (now deceased); his widow, Iberia Barceló de Nevárez, and their daughter María de los Angeles Nevárez, for a total of $75,000 as a result of litigation in the Commonwealth courts. Thus, plaintiff is asserting a subrogation cause of action against the United States government to recover those monies should the government is adjudged liable.

**2.** Passengers Carlos Nevárez (now deceased), his widow Iberia Barceló de Nevárez, and their daughter María de los Angeles Nevárez are not plaintiffs in this action, and as indicated in footnote 1, have settled their claims with the insurance carrier. Although this Court ordered plaintiffs' counsel to substitute in the proper representative parties on behalf of Mr. Carlos Nevárez upon his death on August 20, 1986, this was never done. In any event, we find this issue to be moot now, as a result of the present ruling on this case.

Navy at Desembarcadero Mosquito, in the restricted waters between the ports of Isabel Segunda and Punta Arenas, off the Island of Vieques, Commonwealth of Puerto Rico. Plaintiffs contend that the United States Navy and United States Coast Guard were negligent in failing to adequately mark, illuminate, or otherwise advise the navigating public of the existence and location of the breakwater, and in failing to correctly depict on the applicable nautical chart the location of the red warning lights posted on the pier adjacent to the breakwater. Plaintiffs allege that these purported errors caused them to miscalculate their intended course and collide with the breakwater. Defendant argues that plaintiffs' own negligent conduct was the cause of the accident, and in the alternative, that it was under no duty to mark the breakwater or provide further notice of the chart error than that already published in the U.S. Coast Guard Light Lists.

Upon stipulation by all parties, the bench trial was bifurcated as to the issues of liability and damages. Because we find that plaintiffs' negligence in operating the REMOLONA was the sole cause of the accident, and that defendant had no legal duty to post additional warnings, lights or notices of chart error, the complaint shall be dismissed.

## I. FACTUAL BACKGROUND.

What began as a pleasure trip to the Virgin Islands in July of 1980 ended in near tragedy upon return to the home port of Palmas del Mar in Humacao, Puerto Rico. On July 30, 1980, the 32 foot cabin cruiser REMOLONA departed from St. Thomas at approximately 5:30 P.M., headed for Culebra. The five passengers of the REMOLONA were on the final leg of a six day tour of the U.S. and British Virgin Islands. Plaintiff Gustavo Nevárez was the navigator and co-owner of the boat; his cousin Carlos Nevárez Pérez (now deceased) and his widow, María Isabel Iberia Barceló de Nevárez, were also on board, along with their daughter, Clotilde María de los Angeles Nevárez Barceló. A mutual friend of

the family, Melanie Martínez González, was also present on the trip and is a plaintiff in this matter.

The REMOLONA arrived in Culebra at about 6:45 P.M. After clearing customs, the vessel and its passengers left for a festive dinner at Isabel Segunda Beach on Vieques Island to conclude their six day cruise.

There was some dispute among the passengers about this final dinner as it was already late, and many members of the party had to work the following day. Specifically, María Isabel Iberia Barceló testified that she told Gustavo Nevárez and the others she preferred to take a direct route home. When they elected to stop for dinner anyway, she remained on the boat.

After docking at Isabel Segunda, the other four passengers went a short distance into town for dinner. Alcoholic beverages were consumed with the meal, and Gustavo Nevárez testified that he had two gin-and-tonics: one at 7:00 P.M., and another at 7:30 P.M. By 8:30 P.M., the entire party had returned to the boat and was ready to depart for Puerto Rico. Mr. Nevárez testified that it was a dark night. At 9:00 P.M., the REMOLONA had tragically set in the northern tip of the Desembarcadero breakwater.

In calculating the REMOLONA's route from Vieques to Puerto Rico, plaintiff Gustavo Nevárez, the boat's navigator and co-owner, had plotted a 287° magnetic compass course from Isabel Segunda to a point just north of the Navy breakwater located at Desembarcadero Mosquito. Once having cleared the breakwater, Mr. Nevárez' navigation plan called for the tracing of a 265°M compass course, to arrive at the REMOLONA's final destination of Humacao, Puerto Rico. The breakwater extends approximately 1.2 miles north into the coastal waters of Vieques, and protrudes 5–6 feet above the water surface. About 1,000 feet from the seaward end of the breakwater, a naval munitions pier extends northwest, at almost a right angle to the breakwater, for approximately 600 feet.

It was his intention to use the two red lights depicted on National Ocean Survey Chart 25665 (9th ed. 1979) as being located at each end of the pier adjacent to the breakwater, to visually gauge the point at which to alter his compass course to 265°. In addition, Mr. Nevárez had to calculate this course so as to avoid two partially submerged reefs, Mosquito Reef and Corona Reef, located in close proximity to the breakwater. Following a course of 287°, Mr. Nevárez anticipated steering a narrow trajectory north of the breakwater and south of the reefs. Although he was fully apprised of these navigational obstructions, Mr. Nevárez nonetheless elected to navigate the REMOLONA along his calculated route, rather than through the lighted buoy channel maintained by the U.S. Coast Guard for nightime navigation in the area.[3] The buoy channel was clearly depicted on Chart 25665, was completely free of obstructions, led directly to Humacao, and would have required only 15 minutes of additional travel time.

Furthermore, although Mr. Nevárez was familiar with the area, he had never piloted a vessel through the Desembarcadero Mosquito area at night.

In point of fact, Chart No. 25665 was admittedly erroneous in its positioning of one red light at the seaward end of the pier (18–09–03N, 65–30–75W) and one at the juncture of the pier and the breakwater (18–09–01N, 65–30–51W). Both lights were actually located at the seaward end of the pier; one on each corner (18–09–03N, 65–30–51W). Although the proper position of the lights was noted in the 1979 and 1980 editions of the U.S. Coast Guard Light List, Volume II, Atlantic and Gulf Coast, Mr.

Nevárez admits that he did not consult the Light Lists while plotting and navigating plaintiffs' voyage, nor were they aboard the REMOLONA on the date of the accident.

▌ For this reason, as the REMOLONA advanced on its 287°M Compass course, Mr. Nevárez became confused by the two parallel red lights he saw at the end of the 600′ pier.[4] He therefore adjusted his course approximately 10° south, to avoid Mosquito and Corona reef, continuing at the same speed of 2500 rpm heading towards the breakwater. This 10° adjustment placed the REMOLONA on a collision course with the breakwater, which the REMOLONA subsequently struck at about 50 feet from the northern end. Mr. Nevárez' conduct at this point is particularly imprudent, and more than anything else leads to a finding of plaintiffs' negligence. First, 2500 rpm was too fast a speed for a disoriented navigator on a dark, moonless night. Secondly, once Mr. Nevárez became unsure of his fixed visual references, he should have stopped the REMOLONA to gain his bearings, or at least, he should have slowed the vessel's speed. He was equally improvident in failing to recalculate his position after realizing there was a discrepancy in the only fixed light reference he relied upon to plot his course. Other points of reference, such as lighted channel buoy number 4, or the flashing aerobeacon on the eastern coast of Vieques, were readily visible from the REMOLONA, and would have been sufficient navigational aids to safely guide the boat to Humacao. In the alternative, the REMOLONA could have retraced its course to lighted buoy number 4, and proceeded through the lighted buoy

---

**3.** The uncontroverted testimony of Mr. Francisco Delgado, an experienced and knowledgeable yachtsman, indicates that the lighted buoy channel was unquestionably the safest route. The course plotted by plaintiff actually brought the REMOLONA closer to the reefs he was trying to avoid than the buoy channel would have. Furthermore, Mr. Nevárez' route placed the REMOLONA in the very precarious position of attempting to safely navigate north of the breakwater and south of the two reefs, through a narrow stretch of unlit water replete with hazards. As Mr. Delgado indicated, the lighted

buoy channel was infintely safer than plaintiff's attempt to pass between the breakwater and buoy number 4.

**4.** Although plaintiff Gustavo Nevárez used the word "confused" in his direct testimony and then clarified it to "concerned" upon cross-examination, this Court finds he was confused by the fact that the visual appearance of the pier lights did not correspond to those plotted on NOS Chart 25665.

channel. At the very least, Mr. Nevárez should have assumed a worst-case scenario, i.e., that both lights were placed at the juncture of the pier and the breakwater, so that the breakwater extended 1,000′ north *beyond* the lights, and should have altered his course accordingly. Making a 10° course adjustment south *towards* the unmarked breakwater, while proceeding at 2500 rpm on a dark night was an unquestionably negligent act.

■ Plaintiffs were also negligent in their failure to maintain a proper lookout for the REMOLONA, in violation of Rule 5 of the "Navigation Rules of the Road," 33 U.S.C. foll. sect. 1601 *et seq.* Rule 5 imposes a mandatory duty upon *all* vessels to "at all times maintain a proper lookout ... so as to make a full appraisal of the situation and of the risk of collision." Despite the fact that four of the REMOLONA's passengers were on the flying bridge when the accident occurred, none undertook to scan the ocean surface for the breakwater or reefs that presented such an immediate hazard. Although Mr. Nevárez purported to be maintaining a proper lookout because he had the best vantage point, he was distracted from his duty by navigation of the REMOLONA and his disorientation. As a result, no one saw the breakwater until seconds prior to the collision.

■ This raises a prima facie presumption upon collision with a stationary object that failure to maintain a lookout was negligent, and a proximate cause of the accident. *Rosado v. Pilot Boat No. 1*, 304 F.Supp. 49 (D.P.R.1969).

## II. THERE IS NO DUTY ON THE PART OF THE UNITED STATES TO MARK NAVIGATIONAL HAZARDS.

Even if this Court were to find plaintiffs' conduct was not negligent, or that defendant incurred in comparative negligence, we still would not impute liability to the defendant because it is clear that the United States government owed no duty to plaintiffs to post further markings or illumination on the Naval breakwater.

■ There is a judicially-created exception to liability imposed upon the federal government by the Suits in Admiralty Act when the government is engaged in a discretionary function. *United States v. United Continental Tuna Corp.*, 425 U.S. 164, 96 S.Ct. 1319, 47 L.Ed.2d 653 (1976); *Gercey v. United States*, 540 F.2d 536, 539 (1st Cir.1976), *cert. denied*, 430 U.S. 954, 97 S.Ct. 1599, 51 L.Ed.2d 804 (1977). It is well-established, under both statutory and case law, that the U.S. government's decision whether to mark a known obstruction in a navigable channel, and what type of marking to use, are discretionary determinations outside the purview of the Suits in Admiralty Act.

The authority and ability to mark navigational obstacles is the sole province of the U.S. Coast Guard.

Title 14 U.S.C. sect. 81 states in pertinent part:

In order to aid navigation and to prevent disasters, collisions, and wrecks of vessels and aircraft, the Coast Guard *may* establish, maintain and operate: (1) aids to maritime navigation required to serve the needs of the armed forces or of the commerce of the United States. (Emphasis added.)

Under 14 U.S.C. sect. 86, the Secretary of Transportation, through the U.S. Coast Guard is empowered to "mark for the protection of navigation any sunken vessel or other obstruction existing in navigable waters ... in such manner and for so long as, in his judgment, the needs of maritime navigation require." The statutory language specifically indicates that this authority is purely a discretionary one, and therefore, "generally, the Coast Guard has no duty to establish an aid to navigation and cannot he held liable for failing to do so." *Chute v. United States*, 610 F.2d 7, 11 (1st Cir.1979).

By the same token, judicial review of the Coast Guard's decision to mark an obstruction, and the type of warning or marking used, must be very limited. To allow otherwise would constitute an impermissible

interference with the government's exercise of discretion in a policy-making capacity, as "how much equipment the Coast Guard is to possess, and how much money it is to spend, measure, necessarily, by Congressional appropriations, must be for the government's uncontrolled discretion." *United States v. Sandra & Dennis Fishing Corp.*, 372 F.2d 189, 195 (1st Cir.1967), *cert. denied*, 389 U.S. 836, 88 S.Ct. 52, 19 L.Ed.2d 98 (1967).

■ In *Chute v. United States, supra*, the First Circuit declined to pass on the effectiveness or appropriateness of a Class III buoy posted 100' from the site of a submerged wreck, reasoning that "if the Coast Guard's executive discretion is to remain meaningful at all, its choice as to when to mark and what navigational aid to employ must in all cases be final." 610 F.2d at 13. The court concluded that a substantive review of the Coast Guard's choice of marker would vitiate the discretionary aspect of the government's authority:

> Once the Coast Guard, the agency with special expertise in marking the myriad obstructions to navigation, has reached a reasoned judgment as to the appropriate marking and has accordingly marked, and the government has charted the obstruction, thus enabling a prudent mariner in the exercise of due care to avoid the hazard, all that is required has been done. 610 F.2d at 16.

We find this logic compelling. In the case at bar, the Coast Guard had no duty under 14 U.S.C. sect. 81 and 86 to mark, illuminate, or post any navigational aid on the breakwater at Desembarcadero Mosquito. After reviewing the navigational hazard posed by the breakwater and adjacent pier, the Coast Guard determined that two red flashing lights placed at the seaward end of the pier comprised an adequate marking of the obstruction. The location and the length of both the breakwater and the pier were correctly depicted on all applicable navigational charts. Clearly, any attempt by this Court to review the propriety of the Coast Guard's decision concerning the illu-

mination or marking of the Desembarcadero Mosquito would constitute a direct conflagration of *Chute v. U.S., supra*. The fact that it was feasible for the government to have made the breakwater safer does not warrant a finding of liability. *Bonney v. Canadian National Railway Co.*, 800 F.2d 274 (1st Cir.1986).

The same result was reached by the Seventh Circuit in *Bearce v. United States*, 614 F.2d 556 (7th Cir.1980), under almost identical factual circumstances as those involved in the REMOLONA. In *Bearce*, plaintiff's decedent was killed when his speedboat struck an unmarked, unlit breakwater in the Chicago harbor on Lake Michigan. A second breakwater paralleled the first, and was marked midway with a flashing green light which constituted the only navigational aid in the immediate area, (similar to the red lights posted on the adjacent pier at Desembarcadero Mosquito). In addition, the Coast Guard in BEARCE had at one time recommended the placement of a flashing light on the seaward end of the breakwater, but declined to follow through, as with the Mosquito breakwater.

Citing the First Circuit case of *Gercey v. United States, supra*, the court in *Bearce* held that "the allocation of funds for the construction of new aids to navigation requires policy judgments concerning the public interest, and thus is a discretionary function which courts should not review in the context of a tort claim." 614 F.2d at 561.

It is thus a firmly established rule that the U.S. Coast Guard not only has no duty or responsibility to establish aids to navigation; its exercise of that discretionary authority cannot be subjected to close judicial scrutiny.

### III. PLAINTIFFS' FAILURE TO CONSULT THE U.S. COAST GUARD LIGHT LIST WAS NEGLIGENT.

All parties concede that National Ocean Survey Chart No. 25664 incorrectly repre-

**1236**

sented the red warning lights on the Naval munitions pier, and that this error was rectified by the U.S. Coast Guart Light Lists, Volume II, Atlantic & Gulf Coast, for 1979 and 1980. Plaintiff Gustavo Nevárez did not consult the light lists prior to plotting his voyage, nor did he have the publications aboard the REMOLONA.

■ This Court finds that failure to consult the applicable light list was negligent conduct on the part of Mr. Nevárez, particularly since he intended to rely on the pier lights as his sole fixed point of reference to navigate through that dangerous area. The fact that Mr. Nevárez had never before piloted a craft through the Desembarcadero Mosquito area at night made it even more incumbent upon him to check the light list and verify his bearings. Furthermore, NOS Chart 25664 contains warnings on its face that advise a mariner not to rely on any single aid to navigation, and it specifically admonishes the navigator to "consult U.S. Coast Guard Light List for supplemental information concerning aids to navigation."

■ As the chart implies, it is a well-established rule of navigation that a prudent mariner venturing into coastal waters with known submerged obstructions must always consult the supplemental navigational information contained in the Notice to Mariners—U.S. Light Lists publications. *Benavidez v. U.S.*, 1980 AMC 284; *Hamburger v. U.S.*, 318 F.Supp. 103 (D.Md.1970). Additionally, once having published the chart correction in the Coast Guard Light List, the U.S. Government was thereafter relieved from all liability for the error. *Debardeleben Marine Corp. v. U.S.*, 451 F.2d 140 (5th Cir.1971).

WHEREFORE, having duly considered the testimonial and documentary evidence, as well as the applicable law, the complaint is hereby DISMISSED. The Clerk shall enter judgment dismissing the complaint. Costs to be taxed against plaintiffs.

IT IS SO ORDERED.